# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| ROBERT ANSARA *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 2:19-cv-01394-GMN-VCF |
| vs. | ) | |
| | ) | **ORDER** |
| GLORIA MALDONADO *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is Defendants Clark County, Clark County Department of Family Services ("CCDFS"), Gloria Maldonado, and Audra Gutierrez's (collectively, "Defendants'") Motion for Summary Judgment, (ECF No. 165). Plaintiffs Robert Ansara, Gabrielle Branon-Chesley, and David Banks (collectively, "Plaintiffs") filed a Response, (ECF No. 178), to which Defendants filed a Reply, (ECF No. 184).

For the reasons discussed below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## I.     BACKGROUND

This case arises from the tragic death of a minor child, D.B., caused by Craig Dickens[1] ("Dickens") when he threw D.B. "across the room twice while drunk" at a Siegal Suites in Las Vegas, Nevada. (Sec. Am. Compl. ("SAC") ¶¶ 43–44, ECF No. 64). Plaintiff Robert Ansara brings this action as Special Administrator of the State of D.B., and Plaintiffs

---

[1] On September 13, 2018, Dickens pleaded guilty in state court to Second Degree Murder in violation of NRS § 200.010, 200.03.2, and Child Abuse, Neglect or Endangerment Resulting in Substantial Bodily Harm in violation of NRS § 200.508.2. (*See generally* Dickens Judgment, Ex. X to Mot. Summ. J. ("MSJ"), ECF No. 165).

David Banks ("Banks") and Gabrielle Branon-Chesley ("Gabrielle") are the natural father[2] and mother of D.B., respectively. (*Id.* ¶¶ 2–4).

According to Plaintiffs' allegations, the events leading up to D.B.'s death began on April 23, 2017, when Clark County and CCDFS removed D.B. from the home and care of his natural mother "without any legal or factual basis" and "without warning and without any immediate threat of serious harm from Plaintiffs." (*Id.* ¶¶ 64–65).  The specific facts underlying D.B.'s April 23, 2017, removal are outlined below.

### A.  D.B.'s Removal on April 23, 2017

On April 23, 2017, at 2:50 p.m., Gregory Branon ("Gregory") and Ramona Branon ("Ramona"), Gabrielle's father and mother as well as D.B.'s grandparents, informed Child Protective Services ("CPS") that they suspected Gabrielle drove D.B. to daycare while high on methamphetamine. (CPS Referral Summary at 1, Ex. A to Clark County Resp., ECF No. 186). D.B. Gregory informed CPS that Gabrielle was using methamphetamine multiple times a week, and that she acted irresponsibly when high. (April 23, 2017 Call 15:6–9, 15:24–16:8, Ex. BB to Reply, ECF No. 186).  Gregory further expressed that he was "concerned about [D.B.'s] safety" because he "has absolutely no stability.  But the bigger issue is his safety.  [Gabrielle] drives around with him in the car while she's high as a kite.  And God knows what's happening when she's with other people out of her mind and when she crashes for days at a time." (*Id.* 21:13–19, Ex. BB to Reply).  At this time, D.B. was approximately seventeen months old.[3] (Resp. 1:10–12, ECF No. 178).  At 3:20 p.m., CCDFS employee Danielle Fisher ("Fisher") completed

---

[2] It is disputed whether Banks is the natural father of D.B.  Banks is not listed as D.B.'s father on D.B.'s birth certificate. (Unity Case Notes at 38, Ex. B to MSJ, ECF No. 158); (David Banks Resps. at 170, Ex. S to MSJ, ECF No. 168).  Further, Banks admitted he was not married to Gabrielle at the time of D.B.'s birth. (David Banks Resps. at 170, Ex. S to MSJ).  On July 27, 2017, the Juvenile Court ordered Banks to take a paternity test. (Order for Paternity Testing at 178–79, Ex. W to MSJ, ECF No. 168).  To date, the Court has not received any filing indicating that Banks took the court ordered paternity test, or any paternity test for that matter.
[3] D.B. was born on December 18, 2015. (Resp. 1:10–12, ECF No. 178).

a SCOPE[4] criminal history check on Gabrielle, which located Gabrielle's prior conviction for possession of drugs. (Unity Case Notes at 54, Ex. FF to Reply, ECF No. 186).  At 4:15 p.m., Fisher attempted to call Gabrielle on her cell phone, but the call went straight to voicemail. (*Id*. at 55, Ex. FF to Reply).  Fisher identified herself and advised Gabrielle to call her back. (*Id*., Ex. FF to Reply).  Fisher then drove to D.B.'s daycare. (*Id*. at 56, Ex. FF to Reply).  Fisher spoke to an employee at D.B.'s daycare, who stated that Gabrielle "appear[ed] at times to be out of it," but that D.B. was "always present to the center very cleaned and groomed." (*Id*., Ex. FF to Reply).  Based on the above, Fisher removed D.B. from day care and brought him to the Reception Cottage at approximately 5:00 p.m. (*Id*., Ex. FF to Reply).

**B.  D.B.'s Subsequent Placement with Diamond Ford & Craig Dickens**

Upon learning that D.B. was removed from her custody, Gabrielle expressed that she wanted D.B. to be placed with his grandparents, Gregory and Ramona. (*Id*. at 57, Ex. FF to Reply).  However, Gregory and Ramona explained to caseworkers that they were not a viable long-term placement option for D.B. due to Ramona's position as an international flight-attendant, which required frequent travel, her arthritis, and the couple's advancing age. (*Id*. at 55, Ex. FF to Reply); (April 23, 2017 Call 26:10–17, Ex. BB to Reply).  In the absence of a family placement option, Ramona proposed Ford as a possible out-of-home placement alternative. (Resp. 3:18–21, ECF No. 178).  At the time, Ramona did not express any concerns with Ford and Dickens acting as fictive kin to D.B.[5] (Unity Case Notes at 64, Ex. FF to Reply).

Prior to placing D.B. with Ford and Dickens, Audra Gutierrez ("Gutierrez"), a CPS investigator at CCDFS, investigated Ford and Dickens to determine if they would be suitable

---

[4] SCOPE is an in-state criminal background check run by CCDFS on an individual. (Judy Tudor Dep. 86:6–14, Ex. 3 to Resp., ECF No. 178); (Audra Gutierrez Dep. 106:6–15, Ex. 1 to Resp., ECF No. 178).

[5] Fictive kin is defined as an "individual who is not related to the child by blood or marriage but has a relationship with the family that they identify close association with." (Angela Ranck Dep. 18:14–18, Ex. 2 to Resp., ECF No. 186).

fictive kin. Specifically, Gutierrez and CCDFS conducted a SCOPE and CANS[6] background check on both Ford and Dickens. (Unity Case Notes at 62, Ex. FF to Reply). Neither the SCOPE nor the CANS background check unearthed any prior criminal conduct that would eliminate Ford and Dickens as suitable fictive kin.[7] (*Id.*, Ex. FF to Reply). Additionally, Gutierrez met in-person with both Dickens and Diamond to discuss D.B.'s placement.[8] During Gutierrez's meeting with Dickens, he expressed that "he had experience helping to raise siblings and relatives" although he did not have children of his own. (*Id.* at 63, Ex. FF to Reply). Dickens further "denied any concerns with alcoholic or substance" abuse, as well as "domestic violence or issues" in his relationship with Ford. (*Id.*, Ex. FF to Reply); (Audra Gutierrez Dep. 137:1–17, Ex. 1 to Resp.). Following the completion of the background check, and pursuant to a court order finding it would be "contrary to the welfare" of D.B. to remain in the care of Gabrielle, D.B. thereafter remained in the "custody and control" of Clark County and CCDFS and "in the foster home of Ford and Dickens." (SAC ¶ 33); (Juvenile Court Order at 182, Ex. Z to MSJ, ECF No. 168). D.B.'s official placement with Ford and Dickens led to Gutierrez being replaced by Gloria Maldonado ("Maldonado"), a permanency caseworker at CCDFS, as the individual in charge of D.B.'s file. (Resp. 4:10–14); (Gloria Maldonado Dep. 7:7–8:1, Ex. 4 to Resp., ECF No. 168).

///

///

---

[6] A CANS background check surveys within CCDFS's internal Unity Systems to "see if there's any substantiated allegations of abuse or neglect." (Audra Gutierrez Dep. 48:13–22, Ex. 1 to Resp., ECF No. 178).

[7] Dickens did disclose in his non-primary caregiver application that there were warrants issued for his arrest due to a traffic ticket and writing a bad check. (Dickens Caregiver Application at 176, Ex. T to MSJ, ECF No. 168). These two charges were the extent of Dickens's criminal history that was disclosed to CCDFS.

[8] CCDFS caseworkers neither spoke to the management at Ford and Dickens apartment building, nor their neighbors at the building to discuss if there were any complaints about the couple. (Audra Gutierrez Dep. 103:1–16, Ex. 1 to Resp); (Angela Ranck Dep. 104:6–105:2, Ex. 2 to Resp.). These conversations were not a requirement in completing a placement check. (Audra Gutierrez Dep. 103:1–16, Ex. 1 to Resp.); (Angela Ranck Dep. 104:6–105:2, Ex. 2 to Resp.).

### C.  May 23, 2017, Anonymous Call to the DFS Hotline

On May 23, 2017, CCDFS received an anonymous call alleging that Dickens was an alcoholic who abused Ford.[9]  Based on the information provided in the call, CCDFS determined that there was "not enough information about violence or alcohol use to warrant CPS intervention." (CPS Referral Summary at 135, Ex. M to MSJ, ECF No. 168).  Therefore, the CPS Report that was created in response to the call was designated "Information Only" and did not require any investigation pursuant to CCDFS policy. (Farrah Henson Dep. 43:8–21, Ex. II to Reply, ECF No. 186).  CCDFS supervisor Farrah Henson reviewed and screened the CPS Report. (*Id.*, Ex. II to Reply).

Although CCDFS was not obligated to investigate the May 23, 2017, CPS Referral Summary because of its "Information Only" designation, Angela Ranck, Maldonado's supervisor at CCDFS, instructed Maldonado and Adriana Mendoza ("Mendoza") to conduct an unscheduled permanency placement safety check at Ford and Dickens's home to corroborate the allegations made in the CPS Referral Summary. (Angela Ranck Dep. 61:6–63:20, Ex. 2 to Resp.).  Maldonado and Mendoza conducted this safety check on May 24, 2017. (Unity Case Notes at 17–21, Ex. B to MSJ, ECF No. 168).  Maldonado took photos of D.B. in addition to conducting a bodycheck. (Permanency Placement Safety Check at 113–121, Ex. J to MSJ). Neither the photos of D.B., nor the bodycheck indicated that D.B. had marks or bruises. (Angela Ranck Dep. 88:16–21, Ex. 2 to Resp.); (Permanency Placement Safety Check at 121, Ex. J to MSJ).  Further, Maldonado and Mendoza discussed with Dickens his alleged alcohol and domestic abuse. (Angela Ranck Dep. 67:6–12, Ex. 2 to Resp.).  Maldonado and Mendoza positioned themselves in different areas of the home to better gauge Ford and Dickens's

---

[9] The caller further disclosed that Ford was battling cancer. (CPS Referral Summary at 135, Ex. M to MSJ, ECF No. 168).  Plaintiffs speculate that the anonymous call was made by Ramona's sister Elizabeth Robinson-Francis, who "has a history of working with Social Services in Iowa where she would oversee investigating child placement and allegations of abuse or neglect." (Resp. 4:26–28, ECF No. 178).

reactions. (*Id*. 86:1–7, Ex. 2 to Resp.).  Maldonado and Mendoza additionally searched the home to see if there were signs of substance abuse, including looking for empty alcohol bottles. (*Id*. 86:8–25, Ex. 2 to Resp.).  Based on the permanency safety check, CCDFS determined that D.B. was safe in the care of Ford and Dickens. (*Id*. 62:20–25, Ex. 2 to Resp.)

Although Maldonado did not observe that D.B. had any visible injuries, on May 26, 2017, permanency case-worker Allison Spencer ("Spencer"), while conducting a second unscheduled permanency safety check, noticed that D.B. had a half-inch "scratch on his forehead that was a deep purple and appeared to be an old scratch." (Unity Case Notes at 21, Ex. B to MSJ).  Spencer was informed by Ford that the injury was the result of D.B. scratching himself with a toy, which Spencer noted was consistent with the mark. (*Id.*, Ex. B to MSJ). Spencer otherwise found no marks or bruises on D.B. and recorded that no present danger was "identified at this time." (*Id.*, Ex. B to MSJ).

### D.  May 26, 2017, Emergency Response Team ("ERT") Case Assist Request

On May 26, 2017, Angela Ranck, a CCDFS permanency supervisor and Maldonado's boss, submitted an ERT Case Assist Request ("ERT Request"). (Angela Ranck Dep. 24:16–25:10, Ex. 2 to Resp.).  Ranck explained that the ERT responds to allegations of abuse and neglect that are received by the CCDFS hotline. (*Id.* 93:1–9, Ex. 2 to Resp.).  Ranck issued her ERT Request in response to Ford allegedly allowing Gabrielle and Ramona to have unsupervised contact with D.B. (DPS Emails at 159, Ex. P to MSJ, ECF No. 168). Specifically, Ranck's ERT Request noted that Gabrielle met with Maldonado on May 26, 2017, while high on methamphetamine. (*Id.*, Ex. P to MSJ).  Gabrielle's continued drug-use, in combination with the information Ranck received that Gabrielle was permitted by Ford to see D.B. unsupervised, led Ranck to conclude that Gabrielle posed a danger to D.B.'s welfare. (*Id.*, Ex. P to MSJ).  Although the May 23, 2017, CPS Report was attached to Ranck's ERT Request, she did not find that Dickens's alleged substance and domestic abuse posed a threat to

D.B. (*Id.*, Ex. P to MSJ).  Indeed, Ranck's ERT Request contained no reference to the previous allegations against Dickens. (*Id.*, Ex. P to MSJ); (Audra Gutierrez Dep. 123:1–23, Ex. 1 to Resp.).

Outside of the May 23, 2017, CPS Report, there was no other report indicating that Dickens abused either alcohol or Ford.  Further, the scratch observed by Spencer is the only injury sustained by D.B. that CCDFS noted.  Neither Gabrielle nor any of D.B.'s family members ever raised concerns that D.B. had any marks or bruises in the eighteen subsequent visits they had with D.B. following the May 23, 2017, CPS Report. (Unity Case Notes 66–92, Ex. FF to Reply).

On August 13, 2017, at approximately 2:40 a.m., Las Vegas Metropolitan Police Department officers ("LVMPD") arrived at Ford and Dickens's home. (Resp. 6:21–23, ECF No. 178).  It was later determined that Dickens, in a drunken rage, killed D.B. by picking him up and throwing him against the wall. (*Id.* 6:23–28).  Plaintiffs filed suit and alleged that Ford and Dickens should never have had control over D.B. because of Dickens's alcoholism, his violent tendencies, and because both Ford and Dickens "lacked the skill and capacity to watch over and care for a child under the age of 24 months." (SAC ¶ 37).  Following D.B.'s death, Plaintiffs commenced this action by timely filing their Complaint, (Compl., ECF No. 1), which Plaintiffs amended one day later, (ECF No. 5).  Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), which the Court granted with leave to amend. (*See* Mot. Dismiss, ECF 45); (Mot. Dismiss Order, ECF No. 63).  Plaintiffs timely filed the instant Second Amended Complaint (the "Complaint") (SAC, ECF No. 64).  Defendants filed the present Motion for Summary Judgment. (*See generally* MSJ, ECF No. 165).

## II.   **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.*  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 288–89 (1968)).  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–

24.  If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn

in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

Fed. R. Civ. P. 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  To obtain relief under Rule 56(d), the nonmovant must show "(1) that [he or she] ha[s] set forth in affidavit form the specific facts that [he or she] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential to resist the summary judgment motion." *State of Cal. v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

## III.  <u>DISCUSSION</u>

Plaintiffs' Second Amended Complaint asserts the following claims: (1) violation of Gabrielle, Banks, and D.B.'s right to familial association under the Fourth and Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against Clark County and CCDFS; (2) violation of D.B.'s Fourteenth Amendment Substantive Due Process right to social worker supervision and protection from harm inflicted by a fictive parent pursuant to 42 U.S.C. § 1983 against Defendants;[10] (3) *Monell* liability pursuant to 42 U.S.C. § 1983 against Clark County; (4) violation of Substantive Due Process Rights under the Nevada Constitution against Defendants; (5) negligence and negligent hiring, training, and supervision against Defendants; and (6) wrongful death against Defendants. (*See generally* SAC).

---

[10] As part of this claim, Plaintiffs contend that Maldonado and Gutierrez, "who fail[e]d to discover or report allegedly obvious signs of abuse" and whose neglect thereby "violate[ed]" D.B.'s due-process rights are not entitled to qualified immunity. (Resp. 14:20–27, ECF No. 178).  For the reasons set forth below, the Court finds that Maldonado and Gutierrez did not fail to discover or report alleged signs of abuse in violation of D.B.'s due process rights.  "If no constitutional right was violated, the court need not inquire further" into any qualified immunity analysis. *Flores v. Ryan*, No. 01-cv-1724, at *1 (N.D. Cal. Oct. 10, 2002).  Accordingly, the Court declines to further examine any qualified immunity argument.

Defendants now move for summary judgment on all of Plaintiffs' federal and state-based causes of action.  The Court will first evaluate the federal causes of action,[11] beginning with an examination of whether Clark County and CCDFS violated Gabrielle, Banks, and D.B.'s right to familial association under the Fourth and Fourteenth Amendments by removing D.B. on April 23, 2017, without first obtaining judicial authorization.

### A.  Gabrielle, Banks, and D.B.'s Constitutional Right to Familial Association

As stated, Plaintiffs contend that Clark County by and through CCDFS improperly removed D.B. from Gabrielle's care and custody on April 23, 2017, by failing to obtain judicial authorization prior to removing D.B.  Specifically, Plaintiffs argue that CCDFS failed to investigate reasonable avenues of investigation prior to removing D.B. (Resp. 9:1–12).  Further, Plaintiffs posit D.B.'s removal was improper because he did not face an imminent threat of danger. (*Id*.).

"Parents and children have a well-elaborated constitutional right to live together without governmental interference."[12] *Hardwick v. Cnty of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017).  "The Fourteenth Amendment guarantees that parents will not be separated from their

---

[11] Although Plaintiffs first and second federal causes of action are pursuant to the Fourteenth Amendment's Substantive Due Process Clause, they are derived from separate rights creating distinct claims.  The former implicates Gabrielle, Banks, and D.B.'s right to live together free from government interference. *See Chen v. D'Amico*, No. 16-cv-1877, 2019 WL 2248105, at *21 (W.D. Wash. May 24, 2019) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference.") (citation omitted).  The latter involves D.B.'s right, as a ward of the state, to adequate supervision by social workers who are obligated to protect him from harm inflicted by foster or fictive parents. *See Tamas v. Dep't of Soc. & Health Servs*., 630 F.3d 833, 842 (9th Cir. 2010) ("Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and minimally adequate care . . . .").  Accordingly, the Court's analysis determining whether Clark County and CCDFS improperly removed D.B. is limited to Gabrielle, Banks, and D.B.'s claim concerning their right to Familial Association under the Fourth and Fourteenth Amendment.  The Court separately addresses D.B.'s Fourteenth Amendment Substantive Due Process Right to adequate social worker supervision.

[12] The Fourth and Fourteenth Amendments protect the parent-child relationship from unwanted state interference. *See Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016).  When a child is removed from a parent's home, the parent's right is protected by the Fourteenth Amendment, and the child's right is protected by the Fourth Amendment. *See id*. at 789.  However, "the tests under the Fourth and Fourteenth Amendment for when an official removed a child from parental custody without a warrant are equivalent." *Id*.

children without due process of law except in emergencies." *Mabe v. San Bernardino Cnty,*
*Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001).  Thus, government officials
ordinarily are "required to obtain prior judicial authorization before removing a child from the
custody of her parent." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016) (en
banc); *see Mabe*, 237 F.3d at 1106–07.  However, a government official may remove a child
from a parent's custody without prior judicial if "officials have reasonable cause to believe that
the child is likely to experience serious bodily harm in the time that would be required to obtain
a warrant[.]" *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018); *Kirkpatrick*, 843 F.3d at
790.

Three requirements can be gleaned to satisfy this exception to the general rule requiring
prior judicial authorization.  First, officials "cannot seize children suspected of being abused or
neglected unless reasonable avenues of investigation are first pursued." *Keates v. Kolie*, 883
F.3d 1228, 1237 (9th Cir. 2018).  Second, the injury or abuse to the child must be "articulable,
imminent, and serious," and the official's "reasonable cause" must be "cogent [and] fact-
focused[.]" *Demaree*, 887 F.3d at 883–84.  Third, "because the 'scope of the intrusion' must be
'reasonably necessary to avert' a specific injury, the intrusion cannot be longer than necessary
to avert the injury." [13] *Keates*, 883 F.3d at 1237.  The existence of reasonable cause, the
sufficiency of an investigation, and the scope of an intrusion are questions of fact. *See Wallis v.*
*Spencer*, 202 F.3d 1126, 1138–40 (9th Cir. 2000).  The Court will first turn to the
reasonableness of CCDFS's investigation in determining that removing D.B. was necessary.
///

---

[13] Plaintiffs do not contend that the scope of the intrusion was for longer than necessary to avert the injury. (*See*
*generally* Resp.).  Accordingly, the Court's analysis will be limited to an examination of the reasonableness of
Defendants' investigation and whether there was a reasonable threat of imminent harm to D.B.  The Court notes,
however, that the Juvenile Court's order that it would be contrary to D.B.'s welfare to remain in the custody and
care of Gabrielle evinces that his permanent removal was necessary. (Juvenile Court Order at 182, Ex. Z to
MSJ).

### 1.  Reasonableness of Investigation

Defendants contend that CCDFS investigated reasonable avenues of investigation prior to removing D.B. (Reply 2:9–5:17, ECF No. 183).  In rebuttal, Plaintiffs argue that D.B.'s seizure was unconstitutional because CCDFS failed to conduct a reasonable investigation prior to removing D.B. (Resp. 9:1–10).

First, as to the nature of the allegations, the fact that Gabrielle's parents notified CCDFS that she posed a threat to D.B. strongly weighs in favor of finding that the nature of the allegations were both serious and true. *See Wallis*, 202 F.3d at 1140 ("[O]rdinarily a close relative's tip that a child is about to be killed might provide reasonable cause to believe that an emergency exists and justify a seizure of the child without prior judicial authorization . . . .").  Turning to the time expended investigating and which avenues of investigation were pursued, Fisher reasonably called Gabrielle and left a voice message, researched Gabrielle's criminal history, found a prior conviction for drug possession, visited the daycare and spoke to the daycare provider who described Gabrielle as "appearing at times to be out of it" all in order to ascertain the verity of Gregory and Ramona's accusations. *See Smartwood v. Cnty of San Diego*, 84 F. Supp. 1093, 1108 (S.D. Cal. 2014) (finding that "attempting to call the home daycare owner was a reasonable avenue of investigation" that officers "were required to purse before removing the children").  The only fact cited by Plaintiffs to show that the investigation was unreasonable is that D.B.'s daycare provider "had positive things to say about" Gabrielle. (Resp. 9:18–6).  The positive statements made by the daycare provider, however, are limited to that D.B. was "always present to the center very clean and well groomed." (Unity Case Notes at 9, Ex. B. to MSJ).  This statement does not rebut the allegations by Gabrielle's parents that she was high on methamphetamine.  Equally true is that the daycare provider noted that Gabrielle "does appear at times to be out of it." (*Id*. at 9, Ex. B. to MSJ).  Moreover, Fisher conducted a criminal background check on Gabrielle and attempted to contact her prior to removing D.B.

(Unity Case Notes at 54–56, Ex. FF to Reply).  Taking into consideration the nature of the allegations, the time expended on investigating, and the avenues of investigation pursued, the Court finds that CCDFS made a thorough investigation and exercised reasonable judgment under the circumstances.   The Court will now address whether D.B. faced an imminent threat of harm warranting his removal.

### 2.  Existence of Reasonable Cause

Defendants argue that D.B. faced an imminent threat of harm because Gabrielle drove D.B. to daycare while high on methamphetamine and was going to drive him home while still under the influence. (MSJ 11:19–12:5, ECF No. 165).  In response, Plaintiffs contend that Gabrielle's driving under the influence of methamphetamine did not pose an imminent threat to D.B. because he was at daycare and out of the care of Gabrielle. (Resp. 9:1–12)

In *Kirkpatrick v. County of Washoe*, the Ninth Circuit found no exigent circumstances when a social worker took custody of a newborn at the hospital without a court order. 843 F.3d 784, 792 (2016).  In that case, the mother, Whitworth, admitted to methamphetamine use throughout her pregnancy, including as recently as two days prior to the birth of her child. *Id*. at 786.  Whitworth had two other children who were already in the custody of social services due to her lack of appropriate housing and demonstrated inability to care for her children. *Id*. at 786–87.  There were no allegations of abuse. *See id*.  Social services had an agreement with the hospital to prevent Whitworth from leaving the hospital with B.W. *Id*. at 787, 792.  The hospital discharged B.W. into the care of social services, even though social services did not attempt to obtain a warrant before assuming custody of B.W. *Id*.

This case is distinguishable from *Kirkpatrick*.  Here, there was no agreement in place with the daycare that would prevent Gabrielle from leaving with D.B.  Moreover, in *Kirkpatrick*, social service workers were aware of Whitworth's location.  In this case, Fisher was unable to get in contact with Gabrielle to confirm when she would return to the daycare.

Plaintiffs' argument, namely that D.B. was safe at daycare while out of the care of Gabrielle, ignores the fact that Gabrielle could have returned to the daycare at any time and drove D.B. while high on methamphetamine. Additionally, it ignores the fact that Gabrielle already placed D.B. in danger by driving him to daycare while high on methamphetamine. Without confirmation of when Gabrielle would return, the exigency identified by Defendants was imminent. *See Kirkpatrick*, 843 F.3d at 1192–1201 (finding that no exigency existed that justified warrantless removal because there was no expectation that the baby would imminently leave the hospital); *Curow-Ray v. City of Tumwater*, No. 09-cv-5633, 2010 WL 3222505, at *11 (W.D. Wash. Aug. 12, 2010) (determining that an officer had reasonable cause to believe children faced an imminent risk of harm where "the only parent not in custody was 'teetering on the verge of using meth, was being evicted, and was driving a car'"). Additionally, the Court notes that a finding of reasonable cause is bolstered by Gabrielle's parents notifying CPS that Gabrielle posed an imminent threat to D.B. *See Wallis*, 202 F.3d at 1140 ("[O]rdinarily a close relative's tip that a child is about to be killed might provide reasonable cause to believe that an emergency exists and justify a seizure of the child without prior judicial authorization . . . ."). Therefore, the Court finds that D.B. faced an imminent threat of serious physical injury warranting his removal from Gabrielle. Accordingly, Clark County and CCDFS are entitled to summary judgment as to Gabrielle, Banks, and D.B.'s claim regarding their constitutional right to familial association.

**B.  D.B.'s Right to Social Worker Supervision & Protection from Fictive Parent**

The Fourteenth Amendment typically "does not impose a duty on government officers to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). There are two exceptions to this general rule: the "special relationship" exception and the "state-created danger exception." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). The Court will first turn to the special relationship exception.

1

### 1. Special Relationship Exception

2    Pursuant to the special relationship exception, "[o]nce the state assumes wardship of a

3 child, the state owes the child, as part of that person's protected liberty interest, reasonable

4 safety and minimally adequate care . . . ." *Tamas v. Dep't of Soc. & Health Servs*., 630 F.3d

5 833, 842 (9th Cir. 2010) (quotation omitted).  Thus, a foster child has a Fourteenth Amendment

6 substantive due process liberty interest "in social worker supervision and protection from harm

7 inflicted by a foster parent." *Id*.   To violate this due process right, state officials must act with

8 deliberate indifference to a danger that is known or "so obvious as to imply knowledge." *Id*. at

9 844 (quotation omitted).  Under this doctrine, plaintiffs must prove: "an objectively substantial

10 risk of harm;" (2) the Department was subjectively aware of facts from which an inference

11 could be drawn that a substantial risk of serious harm existed; and (3) the Department either

12 actually drew that inference or a reasonable official would have been compelled to draw that

13 inference. *Id*. at 845.  "Deliberate indifference is 'a stringent standard of fault, requiring proof

14 that a municipal actor disregarded a known or obvious consequence of his action." *Momox-*

15 *Caselis v. Donohue*, 987 F.3d 835, 845 (9th Cir. 2021) (internal citation omitted).

16    Defendants posit that there are no facts which show that they "were subjectively aware

17 of facts from which an inference could be drawn that a substantial risk of serious harm to

18 [D.B.] existed." (MSJ 15:4–17); (Reply 6:4–12).  In response, Plaintiffs contend that

19 Maldonado was deliberately indifferent by failing to investigate Dickens's substance abuse and

20 violent behavior in response to the allegations contained in the May 23, 2017, CPS Referral

21 Summary. (Resp. 11:3–12:2).  Plaintiffs further contend that Maldonado's supervisor, Angela

22 Ranck, "omitted critical facts about [Dickens's] substance abuse and violent behavior when

23 submitting" her ERT Request in light of the fact that the "May 23, 2017, CPS Referral

24 Summary clearly discussed allegations of domestic abuse and neglect." (*Id*. 11:10–12).

25 ///

Past cases which found that officials were deliberately indifferent to a threat of harm share several common features. First, officials in those cases received multiple threats of abuse that were substantiated or came from reliable sources. *Cf. Henry A.*, 678 F.3d 991, 1001 (9th Cir. 2012) (observing that reasonable officials would have understood that failing to authorize a foster child's medical treatment despite knowledge of "his serious illness and repeated requests from his treating physician amounted to deliberate indifference to a serious medical need"); *Tamas*, 630 F.3d at 847 (observing that the social service worker was aware of three separate "graphic allegations" regarding the foster parent's alleged abuse); *E.F. v. Evans*, No. 2:19-cv-01056, 2021 WL 4255048, at *12 (D. Or. Sept. 17, 2021) (finding that a social worker was subjectively aware of facts that would lead a reasonable official to know that a foster parent was potentially dangerous where there were numerous "red flags" including, but not limited to, the foster parent's history of sexual and physical abuse); *D.C. by and through Cabelka v. Cnty of San Diego*, 445 F. Supp. 3d 869, 888 (S.D. Cal. 2020) (determining that the social worker defendants were deliberately indifferent by representing to a foster parent that a foster child had no psychological or behavioral issues when they had several reports which showed that the child was afflicted with both in addition to stating that the child had sexually assaulted his foster siblings); *R.H. v. Cnty of San Bernardino*, No. 5:18-cv-01232, 2020 WL 5775177, at *11 (C.D. Cal. July 31, 2020) (explaining there was sufficient evidence for a jury to conclude there was an obvious and ongoing risk of harm where the County was aware of a prior complaint against a foster parent for physical abuse and social workers received "at least four unusual incident reports" of the foster-children suffering injuries). Thus, in those cases, there was both a sufficient quantity and quality of reports notifying officials of a threat.

Second, the officials in the previously mentioned cases failed to respond to these reports. *See Henry A.*, 678 F.3d at 1001; *Evans*, 2021 WL 4255048, at *12, *D.C. by and through Cabelka*, 445 F. Supp. 3d at 888. The officials' deliberate indifference was thereby derived by

their inaction in the face of a known or likely threat.  Like past cases within the Ninth Circuit which found deliberate indifference, Plaintiffs' special-relationship doctrine claim is premised on Maldonado and Ranck's alleged inaction, that is, their refusal to investigate allegations of Dickens's substance and domestic abuse.

Here, the instant action is distinguishable from prior cases which found deliberate indifference in two key respects.  First, the only allegation of Dickens's substance and domestic abuse were contained in the May 23, 2017, CPS Referral Summary.[14]  This is not to say that a single anonymous call lodging allegations of abuse is categorically insufficient to notify officials that a foster parent poses a threat to the welfare of a child.  But in contrast to prior cases in which officials had access to several reports of abuse that were either substantiated or contained strong indica of reliability, the Defendants in this case only received a single anonymous phone call.  In considering whether Defendants were subjectively aware of facts that would lead them to know that Dickens was potentially dangerous, the fact that there was only one report alleging Dickens had a substance and alcohol abuse problem weighs against a determination that the special-relationship doctrine was violated.

Second, unlike the officials in cases which found deliberate indifference, Maldonado and CCDFS took affirmative actions to corroborate the allegations of abuse lodged against Dickens.  Specifically, even though the May 23, 2017, CPS Referral Summary was designated information only, Maldonado and Mendoza still executed an unscheduled safety check on May 24, 2017, to corroborate Dickens's alleged substance and domestic abuse.  (Angela Ranck Dep. 61:6–63:20, Ex. 2 to Resp.).  During this visit, Maldonado and Mendoza specifically coordinated their movements before the visit and still discovered no evidence that corroborated

---

[14] Dickens had no criminal record involving domestic or substance abuse that would have indicated to CCDFS that he posed a danger to D.B.'s welfare.  Thus, when CCDFS initiated the placement, the proposed placement did not pose an obvious danger to D.B.'s safety. *See Momox-Caselis v. Donohue*, 987 F.3d 835, 846 (9th Cir. 2021) (finding the foster father's criminal history did not pose a substantial risk of harm where "he did not have a violent record").

the allegations of domestic or substance abuse. (*Id*. 62:20–25, Ex. 2 to Resp.). Additionally, CCDFS conducted a second unscheduled safety check on May 26, 2017. Plaintiffs point out that permanency caseworker Spencer noted during this visit that D.B. had a scratch on his forehead. (Unity Case Notes at 21, Ex. B to MSJ). But Plaintiffs ignore that Spencer determined the scratch was consistent with Ford's explanation that D.B. sustained the injury while playing with a toy, and that Spencer otherwise found that D.B. had no marks or bruises. (*Id*., Ex. B to MSJ). Moreover, a half-inch scratch, whether attributed to Dickens or not, neither supports a reasonable inference that Dickens "posed an objectively substantial risk of harm" to D.B. that would culminate in his tragic death, nor that Defendants "actually drew that inference." *Tamas*, 630 F.3d at 845. Turning to Ranck's ERT Request, the Court agrees with Plaintiffs that Ranck omitted the allegations of substance and domestic abuse lodged against Dickens; the Court disagrees, however, that this omission rises to the level of deliberate indifference. Plaintiffs' argument considers Ranck's ERT Request in a vacuum, excluding the totality of the circumstances described above. It fails to consider that Ranck's ERT Request followed CCDFS's attempt to corroborate the allegations against Dickens.

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, U.S. 51, 61 (2011) (citation omitted). Here, Defendants received a single anonymous uncorroborated phone call alleging that Dickens engaged in substance and domestic abuse. Defendants conducted two unscheduled visits to Ford and Dickens's home to verify the allegations in this call. There were no other complaints lodged against Dickens until he tragically took D.B.'s life. Even construing the record in the light most favorable to Plaintiffs, the facts do not support an inference that Defendants were "subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed," and that Defendants "actually dr[e]w that inference." *Tamas*, 630 F.3d at 845.

### 2.  State-Created Danger Doctrine

State actors can also be held liable under the Fourteenth Amendment's Due Process Clause for failing to protect an individual from harm by third parties "where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197, 201). "To determine whether an official affirmatively placed an individual in danger, we ask: (1) whether an affirmative action of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger." *Henry A.*, 678 F.3d at 1002.  The Ninth Circuit has held that "the state created danger doctrine applies to placing a foster child in a home where there is a known danger of abuse," and that it extends to the licensing of foster homes. *Id*. at 1003.

As with Plaintiffs' special relationship claim, their state-created danger claim fails because the facts do not support the inference that Defendants were aware that Dickens posed a known or obvious danger to D.B. *See Momox-Caselis*, 987 F.3d 846 (noting the similarity between the special relationship exception and state-created danger exception, including that the two exceptions "share factors").  Here, the evidentiary record does not indicate that Defendants ignored known or obvious abuse to D.B., chose not to further investigate such possible abuse, or ignored the danger posed by Dickens to D.B. *See Patel*, 648 F.3d at 971–72 (explaining that, although a state generally "is not liable for its omission," the state-created danger rule provides an exception "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger'").  As stated, Dickens had no prior arrests for crimes that would have alerted DFS to his substance or domestic abuse. (Unity Case Notes at 62, Ex. FF to MSJ); *see D.C. by and through Cabelka*, 445 F. Supp. 3d at

889 (finding that officials violated the state-created danger doctrine where social workers had records and a juvenile case file indicating that a foster child had known behavioral issues including sexually aggressive and deviant behaviors but nevertheless placed the child with several young male children); *Tamas*, 630 F.3d at 843 (determining that by approving a foster child's adoption, the state "created a danger of molestation that [the child] would not have faced had the state adequately protected her as a result of referrals [reporting her foster father's physical and sexual abuse]"); *Momox-Caselis*, 987 F.3d at 846 (taking note that the foster father's "criminal history and immigration status . . . did not pose a substantial risk of harm to [the foster child], because he did not have a violent record . . . ."). Further, Defendants conducted two unscheduled safety checks to investigate the allegations of substance and domestic abuse lodged in the May 23, 2017, CPS Referral Summary. These safety checks produced no evidence to corroborate the allegations made in the CPS Referral Summary. It is true that Defendants, by placing D.B. with Ford and Dickens, exposed him to a danger he would not otherwise face. However, for the reasons set forth above, the evidence of this case fails to demonstrate that the danger posed by Dickens was known or obvious, or that Defendants acted with deliberate indifference in the face of that danger.

### C. *Monell* Liability

Next, Plaintiffs argue that *Monell* liability should be imposed against Clark County for two reasons. First, Plaintiffs contend that Clark County failed to provide social workers with adequate training on obtaining warrants for removing children from parental custody and identifying when warrants are required. (Resp. 13:18–25). Second, Plaintiffs maintain that given Maldonado's "position regarding her responsibilities related to the May 23, 2017, CPS Referral Summary," it is clear that CCDFS "neglected to adequately train its permanency caseworkers" to investigate allegations of substance and domestic abuse in fictive kin placements. (*Id*. 13:25–14:2).

"[A] municipal defendant can be held liable because of a failure to properly train its employees only if the failure reflects a 'conscious' choice by the government." *Kirkpatrick*, 843 F.3d at 793. "In other words, the government's omission must amount to a 'policy' of deliberate indifference to constitutional rights." *Id*. "A plaintiff can satisfy this requirement by showing that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id*. at 793–94 (quotation marks and citation omitted). "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. at 794 (quoting *Connick*, 563 U.S. at 61).

Plaintiffs must either present a "pattern of similar constitutional violations by untrained employees" or they must show that the municipality "has failed to train its employees to handle recurring situations presenting an obvious potential for" constitutional violations. *Connick*, 563 U.S. at 61. Satisfying this standard requires proof that the municipality had "actual or constructive notice that a particular omission in their training program" will "cause[] [municipal] employees to violate citizens' constitutional rights." *Id*. (citation omitted). In turn, to demonstrate that the municipality was on notice of a constitutionally significant gap in its training, it is "ordinarily necessary" for a plaintiff to demonstrate a "pattern of similar constitutional violations by untrained employees." *Id*.; *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents."); *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989) ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Further, in order to impose liability on a municipality under this theory there must ///

be some underlying constitutional violation." *Andrade v. City of Burlingame*, 847 F. Supp. 760, 767 (N.D. Cal. 1994).

As an initial matter, the Court notes that Plaintiffs have not "establish[ed] a constitutional right of which [they were] deprived.  Accordingly, [they] cannot make out a *Monell* claim against [Clark County.]" *Acdeo v. Cnty of San Diego*, No. 17-cv-2592, 2018 WL 3425976.  at *10 (S.D. Cal. July 16, 2018); *Andrade*, 847 F. Supp. at 767; *see also Benas v. Baca*, 19 F. App'x 762, 768 (9th Cir. 2005) ("[A]s the district court correctly concluded, [*Monell*] liability may not be imposed absent an underlying violation of the plaintiff's rights that is related to an official policy or custom in question.").  However, even if Plaintiffs had established a constitutional deprivation, their *Monell* claims would still fail for the reasons set forth below.  The Court will first turn to Clark County's alleged failure to train its caseworkers on obtaining a warrant prior to removing children from parental custody.

### 1. Caseworker Training on Obtaining a Warrant

As stated above, Plaintiffs contend that Clark County failed to train social workers on obtaining warrants for removing children from parental custody, and identifying situations when warrants are required. (Resp. 13:18–25).  Here, Plaintiffs neither allege nor produce evidence establishing a "pattern of similar constitutional violations" or even a single similar constitutional violation. (*See generally* Resp.).  Generally, a single incident will not sustain *Monell* liability. *See Olvera v. Cnty of Sacramento*, 932 F. Supp. 3d 1123, 1166 (E.D. Cal. 2013) (dismissing plaintiffs' *Monell* claim where they failed to present "any evidence that prior violations have occurred," and finding that "evidence of a lack of discipline of employees" does not establish "there had been a pattern of similar constitutional violations"); *Garcia v. Cnty of Napa*, No. 21-cv-03519, 2022 WL 110650, at *6 (N.D. Cal. Jan. 12, 2022); (dismissing the plaintiffs' *Monell* claim based on a failure to train where they "support their claim with allegations about only one incident"); *see also Benavidez v. Cnty. of San Diego*, 993 F.3d 1134,

1153-54 (9th Cir. 2021) (applying standard on motion to dismiss and noting that "[a]s with single violations of a written policy, '[T]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.'" (quoting *City of Canton*, 489 U.S. at 390–91)); *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) ("Because Blankenhorn has limited his proof to the City's failure to train only Nguyen, he did not meet his burden to withstand Defendants' motion for summary judgment.").  In the absence of any evidence that prior violations have occurred or that social workers' removal of children without judicial authorization is a recurring situation, Plaintiffs must pursue their *Monell* claim under a "single-incident theory" regarding Clark County's alleged failure to train.  But to the extent that Plaintiffs' claim is based on a "single-incident theory" theory of *Monell* liability, this argument fails.

"Evidence of a pattern of constitutional violations is not always required to succeed on a *Monell* claim." *Kirkpatrick*, 843 F.3d at 794.  In *Kirkpatrick*, the Ninth Circuit held that the County of Washoe was not entitled to summary judgment on a "single-incident" *Monell* claim arising out of the warrantless removal of a child where there was evidence supporting a constitutional violation, as well as "testimony that the County had no policy of obtaining warrants before removing children from parental custody and that it was social workers' regular practice to remove children regardless of the risk of imminent bodily harm." *Kirkpatrick*, 843 F.3d at 796.

In contrast to *Kirkpatrick*, Plaintiffs neither cite to deposition testimony or other evidence which shows that Clark County had a policy or regular practice of removing children regardless of the risk of imminent bodily harm. *Id.*; *see also Williams v. Cnty. of Monterey*, No. 19-cv-01811, 2021 WL 1376029, at *17 (N.D. Cal. Apr. 12, 2021) (denying summary judgment on the plaintiffs' *Monell* claim alleging that the county had a *de facto* policy of

1    removing children without applying for a protective custody warrant where the plaintiff relied

2    on extensive deposition testimony showing that social workers had a repeated practice of not

3    obtaining custody warrants).   Accordingly, even construing the record in the light most

4    favorable to Plaintiffs, a reasonable trier of fact could not conclude that Clark County's training

5    of its social workers was so inadequate as to amount to deliberate indifference to the violation

6    of the constitutional rights of Plaintiffs.

### 2.   Training to Investigate Claims of Substance and Domestic Abuse

8            As previously stated, Plaintiffs' second argument for the imposition of *Monell* liability

9    asserts that Maldonado's alleged failure to investigate the allegations in the May 23, 2017, CPS

10   Referral Summary demonstrates that Clark County "neglected to adequately train its

11   permanency caseworkers" to examine "allegations of substance and domestic abuse in fictive

12   kin placements." (Resp. 12:26–13:3).   Again, Plaintiffs fail to produce evidence establishing a

13   pattern of similar constitutional violations or even a single similar constitutional violation. *See*

14   *D.C. by and through Calbelka*, 445 F. Supp. 3d at 892.   As with Plaintiffs' first *Monell*

15   argument, the viability of Plaintiff second *Monell* argument again hinges on the viability of the

16   "single-incident theory" regarding Clark County's alleged failure to train.

17           Here, Plaintiffs have failed to cite to any persuasive legal authority supporting an

18   argument that the instant case falls within the single-incident exception.   Further, Plaintiffs cite

19   to no evidence or deposition testimony which show that Clark County abdicated its

20   responsibility to train its employees. *See Williams v. Cty. Of Alameda*, 26 F. Supp. 3d 925, 947

21   (N.D. Cal. 2014) ("These 'circumstances' generally involve incidents arising from a total lack

22   of training[.]").   To the contrary, the evidentiary record demonstrates that Maldonado

23   participated in and completed many trainings on out-of-placement safety checks, including

24   those on investigating substance and domestic abuse. (Judy Tudor Dep. 24:16–53:18, Ex. 3 to

25   Resp., ECF No. 178).   The fact that additional training or disciplinary measures "would have

been helpful . . . does not establish municipal liability." *Connick*, 563 U.S. at 68.  Because Plaintiffs have shown "merely that additional training would have been helpful in making decisions[,]" they have not demonstrated that the "single-incident theory" applies in this case. *Id*.  Accordingly, even if Plaintiffs had established a constitutional deprivation, the Court would still find that Clark County is entitled summary judgment on Plaintiffs' claim for *Monell* liability.

### D. Nevada Constitutional Claims

Plaintiffs contend that their "federal due process claims (both removal/notice and substance due process) are analogous" with their claims under the substantive due process clause of the Nevada Constitution. (Resp. 17:14–22).  Defendants do not dispute that Plaintiffs' state constitutional claims are identical to their federal constitutional claims. (Reply 17:6–17).

Nevada's Due Process Clause is textually identical to the Due Process Clause of the Fourteenth Amendment in relevant aspects, *compare* U.S. Const. XIV, § 1, *with* Nev. Const. art. 1, § 8(5), and the Nevada Supreme Court reads the state clause as co-extensive with the federal clause. *See, e.g.*, *Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009); *Southport Lane Equity II, LLC v. Downey*, 177 F. Supp. 3d 1286, 1291 (D. Nev. 2016) (recognizing that claims brought under Nevada's Due Process Clause are parallel and redundant to claims brought under the Due Process Clause of the Fourteenth Amendment).  Therefore, Plaintiffs' claims under the Substantive Due Process clause of the Nevada Constitution are parallel to their Substantive Due Process claims under the Fourteenth Amendment of the United States Constitution. *See Nelson v. Willden*, No. 2:13-cv-00050, 2015 WL 628133, at *5 n.3 (D. Nev. Feb. 12, 2015); *Henry A. v. Willden*, No. 2:10-cv-00528, 2013 WL 759479, at *6 (D. Nev. Feb. 27, 2013).  Accordingly, the Court's previous analysis which found that Clark County and CCDFS did not improperly remove D.B., and that they were not deliberately indifferent to a "objectively substantial risk of harm," correspondingly applies to Plaintiffs' Nevada Constitution claims.  For the reasons

set forth above, the Court GRANTS Defendants' summary judgment on Plaintiffs Nevada

Substantive Due Process claims.

### E.  State Law Claims

The Court will now turn to Plaintiffs' state law claims.  Before the Court addresses the

merits of Plaintiffs' state law claims, however, it must determine whether the Defendants are

entitled to discretionary immunity.

### 1.  Discretionary Immunity

Defendants contend that their "decisions regarding licensing, placement, investigation of

a report, removal, training, supervisory acts, or [their] failure to act" are all actions entitled to

discretionary act immunity under NRS § 41.032(2). (Reply 19:8–15).  In response, Plaintiffs

argue that Defendants are not entitled to discretionary immunity because their actions are not

based on governmental policy considerations. (Resp. 16:6–17:11).

Discretionary act immunity is granted to certain government actors for actions "[b]ased

upon an act or omission of an officer, employee or immune contractor, exercising due care, in

the execution of a statute or regulation, whether or not such statute or regulation is valid;" or

actions "[b]ased upon the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of the State or any of its agencies . . . or of any

officer, employee . . . whether or not the discretion involved is abused." NRS § 41.032(1)–(2).

Under the *Berkovitz-Gaubert* test, government actions fall within the scope of discretionary-

immunity when they: (1) "involve an element of individual judgment or choice," and (2) are

"based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168

P.3d 720, 446–47 (Nev. 2007).  Pursuant to this test, "decisions that occur at all levels of

government, including frequent or routine decisions, may be shielded by NRS § 41.032(2)

discretionary-act immunity, provided the decisions involved government policy concerns."

*Ransdell v. Clark Cnty.*, 192 P.3d 756, 762 (Nev. 2008).

At its core, Plaintiffs argument is that Defendants' actions fail to satisfy the second prong of the *Berkovitz-Gaubert* test. Specifically, Plaintiffs contend that Defendants' decisions to not properly train and supervise its social workers, investigate reports of violence and substance abuse, or exercise reasonable care in assessing potential dangers with fictive kin placements, are actions not based on considerations of social, economic, or political policy. (Resp. 17:3–11). The Court will first examine whether Plaintiffs' negligent hiring, training, and supervision claim is barred by Nevada's discretionary immunity statute.

### a. Negligent, Hiring, Training, and Supervision

The Ninth Circuit established that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000). The Supreme Court of Nevada recently affirmed this view in *Paulos v. FCH1*, 456 P.3d 589, 595 (Nev. 2020) (en banc).

In *Paulos*, the Supreme Court of Nevada specifically analyzed discretionary immunity under the *Berkovitz-Gaubert* test. *Id*. at 26. The *Paulos* court held that LVMPD's decision to hire and train an officer involved a sufficient element of choice and the department's decisions governing the training process are reasonably subject to policy analysis, thus satisfying both prongs of the analysis. *Id*. The Court is persuaded by that reasoning here. CCDFS's "authority over its hiring and training procedures involves a sufficient amount of discretion and decision-making, such that it exceeds the label of operational functions." *Wells v. City of Las Vegas*, No. 2:21-cv-1346, 2022 WL 4625988, at *3 (D. Nev. Sept. 30, 2022); *see Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008), *aff'd*, 371 F. App'x 752 (9th Cir. 2010) (finding acts relating to hiring and training of employees involve elements of judgment and choice). Further, CCDFS's governance over its "own hiring and training procedure is certainly subject to policy analysis, thus meeting prong two of the test." *Wells*,

2022 WL 4625988, at *3; *see Brown v. Tromba*, No. 2:17-cv-02396, 2022 WL 16951439, at *7 (D. Nev. Nov. 14, 2022) ("Decisions about how to properly train and supervise officers are entitled to discretionary immunity because they involve judgment on the part of the policymakers or supervisors and are based on considerations of social, economic, or political policy.") (citing *Paulos*, 456 P.l3d at 595). Therefore, the Court finds that Clark County and CCDFS's decisions regarding employee hiring, training, and supervision of its social service workers is appropriately entitled to discretionary immunity pursuant to NRS § 41.032. Accordingly, the Court grants Defendants' summary judgment as to Plaintiffs' negligent, hiring, training, and supervision claim.

### b. *Failure to Assess Danger, and Investigate Reports of Violence or Substance Abuse*

Plaintiffs additionally contend that Defendants' failure to investigate reports of violence and substance abuse, or exercise reasonable care in assessing potential dangers with fictive kin placements, are actions not based on considerations of social, economic, or political policy. (Resp. 17:3–11).

This Court has recognized that "a social worker's day-to-day supervisory decisions involve a certain degree of personal judgment and choice and thus satisfy the first prong of the *Berkovitz-Gaubert* test, but those decisions are generally not based on governmental policy considerations, as required to satisfy the second prong." *J.M.M. v. Hernandez*, 151 F. Supp. 3d 1125, 1133 (D. Nev. 2015); *but see Momox-Caselis v. Juarez-Paez*, No. 2:16-cv-00054, 2018 WL 6795556, at *10 (D. Nev. Dec. 26, 2018) ("Decisions about how to investigate a report of child abuse and whether to recommend a child be removed form an allegedly abusive home involve individual judgment or choice and are based on considerations of social, economic, or political policy related to the care and protection of foster children."). Defendants' alleged decisions not to investigate reports of violence and substance abuse, or exercise reasonable care

in assessing potential dangers with fictive kin placements "were not based on considerations of social, economic, or political policy; nor are these decisions readily susceptible to policy analysis."[15] *J.M.M.*, 151 F. Supp. 3d at 1134.  Accordingly, Defendants are not entitled to immunity from Plaintiffs' negligence and wrongful death claims under Nevada law.

## 2. Negligence and Wrongful Death

Despite immunity not attaching, these claims do not survive summary judgment. Defendants argue that Dickens' conduct was a superseding intervening cause of D.B.'s death that relieves them of liability for negligence or under Nevada's wrongful death statute. (MSJ 28:9–22).  In rebuttal, Plaintiffs contend that D.B.'s death was proximately caused by Defendants' failure to properly investigate reports of domestic and substance abuse, and provide reasonable supervision over fictive kin caregivers. (Resp. 15:23–16:5).

Under Nevada law, a negligence claim requires a plaintiff to show: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Constr. Co.*, 921 P.2d 928, 930 (Nev. 1996); *see also* NRS § 41.085 (creating a wrongful death cause of action when death is "caused by the wrongful act or neglect of another"). "Whether a defendant owes a plaintiff a duty of care is a question of law." *Scialabba*, 921 P.2d at 930.  Further, under "Nevada's wrongful death statute, a wrongful death claim must be based on some negligence or other wrongful act that causes the death of the decedent." *Conover v. Vons Stores, Inc.*, No. 2:11-cv-01806, 2012 WL 4482591, at *4 (D. Nev. Sept. 25, 2012) (citing NRS § 41.085).

---

[15] The Court considers the argument in *Momox-Caselis v. Juarez-Paez* No. 2:16-cv-00054, 2018 WL 6795556 (D. Nev. Dec. 26, 2018), but does not find it persuasive.  Specifically, the court in *Momox-Caselis* based its reasoning on the Supreme Court of Nevada's decision in *Gonzalez v. Las Vegas Metropolitan Police Dep't*, 129 Nev. 1118 (2013).  *Momox-Caselis*, 2018 WL 679556, at *10.  However, *Gonzalez* concerned whether police officers were entitled to discretionary immunity for their decision to arrest or detain a suspect based on a warrant. Because the facts and circumstances of *Gonzalez* are not analogous to the present case, the Court declines to adopt the reasoning of the court in *Momox-Caselis*.

At bottom, Defendants' argument is primarily concerned with duty and causation, and the foreseeability of Dickens's conduct is the lynchpin of Defendants' duty and causation defenses. Although Dickens' conduct was a superseding cause of D.B.'s death, Defendants could still be held liable under a theory of negligence if they "knew or should have known at the time of the negligent conduct that [it] was creating such a situation that a third party might avail himself of the opportunity to commit such a tort or crime." *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 725 (2009) (quoting Restatement (Second) of Torts § 448 1965)) (internal quotations omitted). Stated differently, while "unlawful conduct can interrupt or supersede the causation between a negligent act and injury, an unlawful act will not supersede causation if it was foreseeable." *Anderson v. Mandalay Corp.*, 358 P.3d 242, 248 (Nev. 2015). Thus, a duty to act would exist if Defendants knew or had reason to know that the criminal acts of a third person "are occurring, or are about to occur" on the premises. *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1882 (1996) (quoting *Early v. N.L.V. Casino Corp.*, 678 P.2d 683, 684 (1984)).

Here, the evidentiary record does not support Plaintiffs' argument that Dickens conduct was foreseeable for two reasons. Defendants investigated the allegations regarding Dickens's substance and domestic abuse, but two unscheduled permanency safety-checks unearthed no other evidence corroborating said abuse. Further, three months lapsed between the May 23, 2017, CPS Referral Summary and D.B.'s death without any substance or domestic abuse complaint against Dickens. The significant span of time separating the CPS Referral Summary and D.B.'s death, coupled with the fact that there was only one uncorroborated allegation of Dickens's substance and domestic abuse, militate a finding that Defendants did not know or had reason to know that Dickens was going to harm D.B. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' negligence and wrongful death claims.

///

### F.  David Banks' Standing to Sue

Defendants additionally argue that Banks has no standing to sue as D.B.'s heir because he is not presumed to be D.B.'s father under the applicable Nevada statutes and has failed to take a paternity test throughout the pendency of this litigation. (MSJ 29:1–9); (Reply 20:10–21:9).  Plaintiffs "request that Banks be given more time to complete a paternity test while" Defendants' motion for summary judgment "is pending." (Resp. 18:10–11).  Plaintiffs provide no other explanation for Banks continued failure to take a paternity test. (*See generally* Resp.).

"Under Nevada law, a decedent's heirs and personal representatives may bring a claim against any person who caused the death by 'wrongful act or neglect.'" *Neal-Lomax*, 574 F. Supp. 2d at 1192–93 (quoting NRS § 41.085).  Here, Banks is not listed as D.B.'s father on D.B.'s birth certificate. (Unity Case Notes at 38, Ex. B to MSJ); (David Banks Resps. at 170, Ex. S to MSJ, ECF No. 168).  Further, Banks admitted he was not married to Gabrielle at the time of D.B.'s birth. (David Banks Responses at 170, Ex. S to MSJ).

On July 27, 2017, the Juvenile Court ordered Banks to take a paternity test. (Order for Paternity Testing at 178–79, Ex. W to MSJ, ECF No. 168).  To date, the Court has received no filing indicating that Banks has taken any paternity test.  Additionally, none of the presumptions of parenthood codified in NRS § 12.6051 apply to Banks.  Based on the 2019 filing date of the initial Complaint, (ECF No. 1), and the 2017 Juvenile Court's order, Banks has either had five or three years to take a paternity test.  As Plaintiffs have failed to offer any evidence showing that Banks is D.B.'s father, the Court finds that summary judgment be entered against Banks on all his claims because he lacks standing.

For the reasons set forth above, the Court finds that Defendants are entitled to summary judgment on all of Plaintiffs' causes of actions.

///

///

IV.     **CONCLUSION**

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 165), is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall close the case and enter judgment accordingly.

**DATED** this __28__ day of December, 2022.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT